[Cite as *In re F.M.*, 2012-Ohio-1082.]

COURT OF APPEALS
TUSCARAWAS COUNTY, OHIO
FIFTH APPELLATE DISTRICT

IN THE MATTER OF:


F.M. AND M.M.


ABUSED, NEGLECTED and
DEPENDENT CHILDREN

JUDGES:
Hon. William B. Hoffman, P. J.
Hon. Sheila G. Farmer, J.
Hon. John W. Wise, J.

Case No. 2011 AP 07 0029


O P I N I O N


CHARACTER OF PROCEEDING:     Civil Appeal from the Court of
Common Pleas, Juvenile Division,
Case No. 11 JN 00181

JUDGMENT:     Affirmed


DATE OF JUDGMENT ENTRY:     March 15, 2012


APPEARANCES:

For Appellee

DAVID W. HAVERFIELD
TUSCARAWAS DJFS
389 16th Street, SW
New Philadelphia, Ohio 44663

Guardian ad Litem

GERRIT DENHEIJER
121 East Main Street
Ravenna, Ohio 44266

For Appellants-Parents

DAN GUINN
407 Sixth Street, NW
New Philadelphia, Ohio 44663

*Wise, J.*

{¶1}    Appellants Charles Meese and Linda Meese (parents) appeal the decision of the Tuscarawas County Court of Common Pleas, Juvenile Division, which adjudicated their minor child, F.M., as dependent, neglected, and abused, and their minor child, M.M., as dependent. Appellee is the Tuscarawas County Department of Job and Family Services ("TCJFS"). The relevant facts leading to this appeal are as follows.

{¶2}    Appellants are the parents of the children at issue in this matter, F.M., who was born in 1996, and M.M., who was born in 1998.

{¶3}    On or about April 4, 2011, TCJFS filed a complaint in the Tuscarawas County Court of Common Pleas, Juvenile Division, alleging F.M. and M.M. to be dependent, neglected, and/or abused children. TCJFS filed the complaint based on concerns raised by middle school officials after noticing extensive leg bruising on F.M., as further discussed infra.

{¶4}    The trial court initially placed the two children with their maternal grandmother.

{¶5}    The matter proceeded to an adjudicatory hearing on May 18, 2011.

{¶6}    The trial court thereupon found F.M. to be a dependent, neglected, and abused child and M.M. to be dependent. The matter proceeded to disposition on May 31, 2011. At that time, appellants stipulated to the agency's case plan. Placement of both children was maintained with the maternal grandmother, with protective supervision of TCJFS. See Judgment Entry, June 3, 2011.

{¶7}    On July 5, 2011, appellants filed a notice of appeal. They herein raise the following four Assignments of Error:

{¶8} "I.  THE COURT ERRED IN FINDING F.M. TO BE AN ABUSED CHILD UNDER OHIO REVISED CODE SECTION 2151.031.

{¶9} "II.  THE COURT ERRED IN FINDING F.M. TO BE A NEGLECTED CHILD UNDER OHIO REVISED CODE SECTION 2151.03.

{¶10} "III.  THE COURT ERRED IN FINDING BOTH F.M. AND M.M. TO BE DEPENDENT CHILDREN UNDER OHIO REVISED CODE SECTION 2151.04.

{¶11} "IV.  APPELLANTS WERE DENIED DUE PROCESS OF LAW AND THE RIGHT TO A FAIR TRIAL WHERE THE TRIAL JUDGE EXHIBITED BIAS TOWARDS THEM THROUGHOUT THE PROCEEDINGS."

I.

{¶12} In their First Assignment of Error, appellants contend the trial court erroneously adjudicated F.M. as an abused child under R.C. 2151.031. We disagree.

{¶13} Pursuant to R.C. 2151.35(A), a trial court must find that a child is an abused, neglected, or dependent child by clear and convincing evidence. *In re Kasper Children* (June 30, 2000), Stark App.No. 1999CA00216. As a general rule, the trier of fact is in a far better position to observe the witnesses' demeanor and weigh their credibility. See *State v. DeHass* (1967), 10 Ohio St .2d 230, 227 N.E.2d 212. As an appellate court, we neither weigh the evidence nor judge the credibility of the witnesses. Our role is to determine whether there is relevant, competent and credible evidence upon which the fact finder could base its judgment. *Cross Truck v. Jeffries* (Feb. 10, 1982), Stark App. No. CA–5758. Accordingly, judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed as

being against the manifest weight of the evidence. *C.E. Morris Co. v. Foley Construction* (1978), 54 Ohio St.2d 279, 281, 376 N.E.2d 578.

{¶14} Clear and convincing evidence is defined as the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty, as required beyond a reasonable doubt, as in criminal cases. *In re: Z.N.*, Licking App.No. 11–CA–0015, 2011-Ohio-3221, ¶ 18, quoting *Cross v. Ledford* (1954), 161 Ohio St. 469, 120 N.E.2d 118; *In re: Adoption of Holcomb* (1985), 18 Ohio St.3d 361, 481 N.E.2d 613. Furthermore, in a bench trial, a trial court judge is presumed to know the applicable law and apply it accordingly. *Walczak v. Walczak,* Stark App.No. 2003CA00298, 2004-Ohio-3370, ¶ 22, citing *State v. Eley* (1996), 77 Ohio St.3d 174, 180-181, 672 N.E.2d 640.

{¶15} R.C. 2151.031 defines an "abused child," in pertinent part, as any child who:

{¶16} " ***

{¶17} "(B) Is endangered as defined in section 2919.22 of the Revised Code, except that the court need not find that any person has been convicted under that section in order to find that the child is an abused child;

{¶18} "(C) Exhibits evidence of any physical or mental injury or death, inflicted other than by accidental means, or an injury or death which is at variance with the history given of it. Except as provided in division (D) of this section, a child exhibiting evidence of corporal punishment or other physical disciplinary measure by a parent, guardian, custodian, person having custody or control, or person in loco parentis of a

child is not an abused child under this division if the measure is not prohibited under section 2919.22 of the Revised Code.

{¶19} "(D) Because of the acts of his parents, guardian, or custodian, suffers physical or mental injury that harms or threatens to harm the child's health or welfare.

{¶20} " ***."

{¶21} In turn, R.C. 2919.22 states in pertinent part:

{¶22} " ***

{¶23} "(B) No person shall do any of the following to a child under eighteen years of age or a mentally or physically handicapped child under twenty-one years of age:

{¶24} "(1) Abuse the child;

{¶25} "(2) Torture or cruelly abuse the child;

{¶26} "(3) Administer corporal punishment or other physical disciplinary measure, or physically restrain the child in a cruel manner or for a prolonged period, which punishment, discipline, or restraint is excessive under the circumstances and creates a substantial risk of serious physical harm to the child;

{¶27} "(4) Repeatedly administer unwarranted disciplinary measures to the child, when there is a substantial risk that such conduct, if continued, will seriously impair or retard the child's mental health or development;

{¶28} " ***."

{¶29} Our review of the record reveals the following summary of evidence:[1]

---

[1] The witnesses included Jeffery Duvall, a martial arts student who trains at Charles' studio; Samuel Hitchcock, a Dover police captain; and Donald Woods, a New Philadelphia police officer who studies tae kwon do at the studio. Although we have

### F.M. Testimony

**{¶30}** F.M. recalled that on the Friday before spring break (March 25, 2011), she went to a friend's house without permission from her parents. She and the friend then began walking to a male acquaintance's house. According to F.M., when Appellant Charles Meese found her, he grabbed her by the hair, punched her in the back of her head, and forced her into the car. When they got back home, appellant again grabbed her hair, punched her, and dragged her into the house. Charles further "kicked [her] up against the cupboard." Tr. at 9-10. One of the punches landed near her eye and caused a nosebleed. F.M. also testified that Charles threatened her with a knife after they got inside. Dover police officers later arrived at the house, but they were simply told a "screaming fight" had occurred. Tr. at 13. F.M. noted that Charles told her to stay in the bathroom when the police arrived. F.M. also recalled other unspecified fights between herself and Charles that week, and stated that Charles has gotten physical with her mother and M.M. in the past as well.

**{¶31}** F.M. testified that she has extensively trained in martial arts, and that Charles runs a martial arts instruction studio. She maintained that she had never received any extensive injuries or bruising from her martial arts weapon training, except for a cut elbow on one occasion.

### Julie Smith Testimony

**{¶32}** The next witness for TCJFS was Julie Smith, the middle school guidance counselor. She noted that neither F.M. nor M.M. had any significant behavioral problems at school. She recounted the events of April 4, 2011, when F.M. reported the

---

reviewed their testimony, in the interest of judicial economy we will not herein recite the details thereof.

March 25th incident to school authorities. Smith also discussed F.M.'s apparent incident of intentionally cutting herself, stating this activity was not inconsistent with F.M.'s description of her home environment prior to agency intervention.

### Crystal Lawless Testimony

{¶33} Crystal Lawless, an investigator from TCJFS, testified regarding the results of her investigation. After school authorities contacted the agency about F.M., she went to the middle school and observed and took photographs of the child. During her interview, F.M. advised her that Charles had caused the injuries ultimately shown in the photographs. When Lawless discussed the concerns with F.M.'s and M.M.'s mother, Linda Meese, she did not appear to be surprised by the same. Linda acknowledged to her that she was aware of the bloody nose and the hair pulling incidents, but Linda essentially attributed the extensive bruising on F.M. to martial arts.

### M.M. Testimony

{¶34} Appellants called their son, M.M., as their first witness. He indicated that he has gotten bruised on his legs before in martial arts training, on some occasions because of using nunchuck weapons (nunchakus). He testified that he did not see Charles hit F.M. on the nose during the March 25th incident, although he was present at that time.

### Appellant Charles Meese Testimony

{¶35} Appellant Charles testified concerning the situation with his children, particularly with F.M. He stated he has used spanking in the past, describing the family as a "taekwondo family." Tr. at 133. Prior to the events of March and April 2011, Charles took her cell phone back and cut off her use of Facebook over concerns that she was

not following parental rules regarding meeting with her friends. Charles also testified that she was sending and receiving inappropriate text messages and cell phone photos. He recalled that F.M. was "distraught" after losing her social media connections, and that he "observed her pounding her legs in the karate school and at home." Tr. at 143, 144. He also claimed that F.M. had bruised herself in the past while using or practicing with nunchucks.

{¶36} Charles also gave his version of the March 25th incident. After F.M. had left the house and could not be immediately located, Charles went out to look for her. He testified that he thereafter saw her outside with two boys, one of whom she was grabbing in the groin and "butt area." Tr. at 150. Charles recalled using force to get F.M. into the car and subsequently into the house. He also admitted to spanking F.M. with an open hand on this occasion, but not striking her in the eye or nose. He elaborated as follows:

{¶37} "Okay, so she, she's on her back, she's got her feet up, and she started kicking at me, so I took my left hand and I pinned down her, her left leg, and I said, what in the fuck do you think you're doing, so about ten times I spanked her with an open hand.  Then I got up and I went back into the kitchen where my plate and my stuff was at, and she was in the living room, two completely separate rooms, we're about twenty feet apart at this point.  I picked up my, I picked up my cup and I stepped out and I scolded her, and I can't even remember exactly what I was saying, but I was just scolding her about the stress that she put the family under when we go and we do all these stranger danger classes and things like that, that she put the whole family under this stress * * *." Tr. at 152.

**{¶38}** In regard to the allegation that he threatened F.M. with a knife, he stated he never approached her with it, recalling the reason he had the knife as follows:

**{¶39}** "Because my nervous energy was here on [F.M.], I just spanked her, I was upset at her, and I don't usually deal with, with any kind of disciplinary act, uh, when I'm, when I'm angry because I don't want to, I don't want to hurt them, you know, I don't want to be an abuser like I'm being accused of, but, uh, sometimes they do need to be disciplined for whatever reason, but I took that nervous energy into a different room and that nervous energy went to clean up my plate and my utensils".  Tr. at 155.

**{¶40}** Charles also told the court that F.M. participated in a martial arts demonstration, including using nunchucks, at an area mall on March 26, 2011, and that she did not act like she was hurt. A video of the demonstration was played and entered into evidence.

**{¶41}** On cross-examination, the agency challenged Charles on his testimony in earlier proceedings in the case wherein he never admitted spanking F.M. with an open hand. He acknowledged leaving out details previously, especially the claim that F.M. had been "pounding" her legs. He noted: "I was answering the questions the way I was told to answer them[,] just truthfully and, and, uh, without going into much detail." Tr. at 182.

<u>*Anne Crabtree Testimony*</u>

**{¶42}** Appellants also called Anne Crabtree as a witness. Her daughter also takes classes at the Meese's martial arts school. Tr. at 193. She stated that F.M. had visited her home the Saturday before the children were removed by the agency. She saw F.M.'s lower legs and recalled that "[s]he had four to six bruises on her shin and

when I asked her where they came from she said bow staff practice." Tr. at 194. She stated she is a mandated reporter and has been trained in this area, but she did not think F.M. was abused at that time. Tr. at 196. However, after viewing the photographs at the adjudicatory hearing, Anne was admittedly "startled" and testified: "If I'd have seen [F.M.] looking like that I'd have called Child Services on the spot." Tr. at 200.

### *K.C. Testimony*

**{¶43}** Another witness called by appellants was K.C., age 13, who testified that she attends classes at the martial arts school. She stated she has trained with nunchucks and has hit herself a lot. Also, due to her martial arts training, she has typically received bruising all over her legs.

### *Appellant Linda Meese Testimony*

**{¶44}** Linda Meese testified that F.M. had been "real disrespectful" during the times in question (Tr. at 207), and she conceded that Charles had spanked F.M. on March 25, 2011, but "that was about it." Tr. at 210. Linda recalled that the knife incident was essentially part of Charles' picking up his plates and utensils after dinner, and that Charles did not come at F.M. with the knife. She observed that F.M. acted normally on the next day, when the mall demonstration took place. Linda denied that Charles had ever hit her or their son, M.M.

**{¶45}** On cross-examination, Linda admitted to leaving out details, in earlier proceedings, concerning Charles' spanking of F.M.

### *Analysis and Conclusion*

**{¶46}** This case involved the thorough evidentiary presentation of widely varying versions of difficult events within the four walls of a family home. As such, the guidance

of *DeHass*, that the trier of fact is in a far superior position to gauge demeanor and credibility, is even more pronounced. Upon review, in light of the testimony presented by TCJFS at trial, and despite the countervailing testimony presented by appellants, we are not inclined to disturb the evidentiary determinations of the trial court as the fact finder in this instance, and we hold the evidence presented supports the conclusion that F.M. is an abused child pursuant to the statute, as we determine that there was at least competent, credible evidence for the juvenile court judge to conclude that Charles' actions in repeatedly striking the child and grabbing her hair went beyond the bounds of legitimate corporal punishment.

{¶47} Appellants' First Assignment of Error is therefore overruled.

II.

{¶48} In their Second Assignment of Error, appellants contend the trial court erroneously adjudicated F.M. as a neglected child under R.C. 2151.03. We disagree.

{¶49} Pursuant to R.C. 2151.03(A), a "neglected child" includes any child:

{¶50} "(1) Who is abandoned by the child's parents, guardian, or custodian;

{¶51} "(2) Who lacks adequate parental care because of the faults or habits of the child's parents, guardian, or custodian;

{¶52} "(3) Whose parents, guardian, or custodian neglects the child or refuses to provide proper or necessary subsistence, education, medical or surgical care or treatment, or other care necessary for the child's health, morals, or well being;

{¶53} "(4) Whose parents, guardian, or custodian neglects the child or refuses to provide the special care made necessary by the child's mental condition;

**{¶54}** "(5) Whose parents, legal guardian, or custodian have placed or attempted to place the child in violation of sections 5103.16 and 5103.17 of the Revised Code;

**{¶55}** "(6) Who, because of the omission of the child's parents, guardian, or custodian, suffers physical or mental injury that harms or threatens to harm the child's health or welfare;

**{¶56}** "(7) Who is subjected to out-of-home care child neglect."

**{¶57}** In the case sub judice, TCJFS concedes that much of the above statute does not apply to the present circumstances. However, as the agency properly responds, a parent who turns a blind eye to abuse suffered by one of his or her children violates a duty of care and support sufficient to place the affected child within the purview of a neglected child. Cf. *In re A.C.*, Cuyahoga App.No. 89191, 2007-Ohio-5539, ¶ 23. In the case sub judice, as more fully set forth under the first assigned error, the evidence demonstrates that Linda knew about abusive activity in the home (see Tr. at 210, 217), but she took no action and effectively blamed F.M. for the injuries at issue. Under these circumstances, we find the trier of fact could have properly found F.M. to be a neglected child pursuant to statute.

**{¶58}** Accordingly, appellants' Second Assignment of Error is overruled.

III.

**{¶59}** In their Third Assignment of Error, appellants contend the trial court erroneously adjudicated F.M. and M.M. as dependent children under R.C. 2151.04. We disagree.

**{¶60}** Pursuant to R.C. 2151.04, a "dependent child" means any child:

{¶61} "(A) Who is homeless or destitute or without adequate parental care, through no fault of the child's parents, guardian, or custodian;

{¶62} "(B) Who lacks adequate parental care by reason of the mental or physical condition of the child's parents, guardian, or custodian;

{¶63} "(C) Whose condition or environment is such as to warrant the state, in the interests of the child, in assuming the child's guardianship;

{¶64} "(D) To whom both of the following apply:

{¶65} "(1) The child is residing in a household in which a parent, guardian, custodian, or other member of the household committed an act that was the basis for an adjudication that a sibling of the child or any other child who resides in the household is an abused, neglected, or dependent child.

{¶66} "(2) Because of the circumstances surrounding the abuse, neglect, or dependency of the sibling or other child and the other conditions in the household of the child, the child is in danger of being abused or neglected by that parent, guardian, custodian, or member of the household."

{¶67} A finding of dependency under R.C. 2151.04 must be grounded on whether the children are receiving proper care and support; the focus is on the condition of the children. See *In re Bibb* (1980), 70 Ohio App.2d 117, 120, 435 N.E.2d 96. "The determination that a child is dependent requires no showing of fault on the parent's part." *In re Bolser* (Jan. 31, 2000), Butler App.Nos. CA99–02–038, CA99–03–048, 2000 WL 146026. However, a court may consider a parent's conduct insofar as it forms part of the child's environment. *In re Alexander C.,* 164 Ohio App.3d 540, 843 N.E.2d 211,

2005–Ohio–6134, ¶ 51, citing *In re Burrell* (1979), 58 Ohio St.2d 37, 39, 388 N.E.2d 738.

**{¶68}** We remain mindful that our task on appeal is to determine whether there is relevant, competent and credible evidence upon which the trial court could base its judgment. *Cross Truck*, *supra*. Furthermore, in issues of dependency determination, "the law does not require the court to experiment with the child's welfare to see if * * * [the child] will suffer great detriment or harm." *In re Burchfield* (1988), 51 Ohio App.3d 148, 156, 555 N.E.2d 325.

**{¶69}** Upon review, and in light of our previous analysis regarding the abuse and neglect allegations in this case, we again are not inclined to disturb the evidentiary determinations of the trial court, and we hold the evidence presented supports the conclusion that F.M. and M.M. are dependent children under the statute.

**{¶70}** Appellants' Third Assignment of Error is overruled.

IV.

**{¶71}** In their Fourth Assignment of Error, appellants contend the trial court's alleged bias during the proceedings denied them of due process of law and a fair trial.

**{¶72}** Appellants' brief rather disparagingly charges, among other things, that the trial court judge essentially assisted Appellee TCJFS in the presentation of its case (Appellant's Brief at 35) and that "it was as if [the judge's] mind was already made up and she did not want to hear anything that the Appellants or their witnesses had to say." (Appellant's Brief at 37). However, it is well-established that pursuant to R.C. 2701.03, the Chief Justice of the Supreme Court of Ohio has exclusive jurisdiction to determine a claim that a common pleas judge is biased or prejudiced. See *Jones v. Billingham*

(1995), 105 Ohio App.3d 8, 11, 663 N.E.2d 657. If a common pleas litigant wishes to raise a challenge to a trial judge's objectivity, he or she must utilize the procedure set forth in R.C. 2701.03. See *In re Baby Boy Eddy* (Dec. 6, 1999), Fairfield App.No. 99 CA 22, 2000 WL 1410. In the case sub judice, there is no indication that appellants followed the necessary procedures to bring a bias claim before the Chief Justice, particularly during the window of time between the adjudication hearing of May 18, 2011 and the dispositional hearing of May 31, 2011.

**{¶73}** Appellants' Fourth Assignment of Error is therefore overruled.

**{¶74}** For the reasons stated in the foregoing opinion, the judgment of the Court of Common Pleas, Juvenile Division, Tuscarawas County, Ohio, is hereby affirmed.

By: Wise, J.

Farmer, J., concurs.

Hoffman, P. J., concurs separately.

_____

_____

_____

JUDGES

JWW/d 0224

*Hoffman, P.J., concurring*

{¶75} I concur in the majority's analysis and disposition of Appellants' first, second and third assignments of error.

{¶76} I further concur in the majority's disposition of Appellants' fourth assignment of error.  While I recognize Appellants failed to follow the procedure set forth in R.C. 2701.03, I also recognize the practical difficulties that arise in doing so once a trial has commenced and the **alleged** instances of bias are both progressive and cumulative in nature.  If the **alleged** bias is so obvious upon the record to the extent the record reflects the complete abandonment of a fair trial (i.e. a plain error type analysis), I am inclined not to find waiver for failure to seek recusal.  However, upon my review of Appellants' claims, I find they do not affirmatively demonstrate bias, let alone a bias that would rise to the level of plain error.

 

_____
HON. WILLIAM B. HOFFMAN

IN THE COURT OF APPEALS FOR TUSCARAWAS COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| IN THE MATTER OF: | : | |
| | : | |
| | : | |
| F.M. AND M.M. | : | JUDGMENT ENTRY |
| | : | |
| | : | |
| ABUSED, NEGLECTED AND | : | |
| DEPENDENT CHILDREN | : | Case No. 2011 AP 07 0029 |

For the reasons stated in our accompanying Memorandum-Opinion, the judgment of the Court of Common Pleas, Juvenile Division, Tuscarawas County, Ohio, is affirmed.

Costs assessed to appellants.

_____

_____

_____

JUDGES